Filed 9/23/15; pub. order 10/15/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BERKELEY HILLSIDE PRESERVATION et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF BERKELEY et al., <br><br>     Defendants and Respondents; <br><br> DONN LOGAN et al., <br><br>     Real Parties in Interest and Respondents. | A131254 <br><br> (Alameda County <br> Super. Ct. No. RG10517314) |

Real parties in interest and respondents Mitchell Kapor and Freada Kapor-Klein secured permits from respondent City of Berkeley (City) to build a large home on a large lot in the Berkeley hills, and appellants Berkeley Hillside Preservation and Susan Nunes Fadley challenged the project under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.).[1] The first time we considered this challenge, we concluded, contrary to the City's determination, that the project presented unusual circumstances, thus triggering an exception to CEQA's categorical exemptions (Cal. Code Regs., tit. 14, § 15300.2, subd. (c); see *id.*, § 15000 et seq., Guidelines for Implementation of CEQA (Guidelines)) and requiring the preparation of an environmental impact report (EIR). The Supreme Court reversed, held that a potentially

---

[1] All statutory references are to the Public Resources Code.

1

significant environmental effect is not alone sufficient to trigger the unusual circumstances exception, and provided detailed guidance on the applicable standards of review in a challenge to an agency's determination that the unusual circumstances exception is inapplicable. The Court remanded to us so that we could properly analyze whether the exception applies. Having done so, we now conclude that sufficient evidence supports the City's conclusion the project is categorically exempt from further CEQA review. We therefore affirm the trial court's order denying appellants' petition for a writ of mandate.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND[2]

Kapor and Kapor-Klein want to build a large house on a lot they own on Rose Street. "The lot is on a steep slope (approximately 50 percent grade) in a heavily wooded area. In May 2009, their architect applied to the City for a use permit to demolish the existing house on the lot and to build a 6,478-square-foot house with an attached 3,394-square-foot 10-car garage. The residence would be built on two floors, would include an open-air lower level, and would cover about 16 percent of the lot." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1093 (*Berkeley Hillside*).)

The City's zoning adjustments board (Board), after holding a public hearing and receiving comments about the project, approved the use permit in January 2010. It found the project exempt from CEQA review under two different categorical CEQA exemptions, which are "classes of projects that have been determined not to have a significant effect on the environment." (§ 21084, subd. (a).) The first exemption, "Class 3," includes "construction and location of limited numbers of new, small facilities or structures," including "[o]ne single-family residence, or a second dwelling unit in a residential zone," and "up to three single-family residences" "[i]n urbanized areas." (Guidelines § 15303, subd. (a).) The second exemption, "Class 32," applies to a project

---

[2] The Supreme Court summarized the relevant factual and procedural background of this case, and we quote its opinion liberally.

"characterized as in-fill development" meeting the following conditions: (1) it "is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations"; (2) it "occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses"; (3) its "site has no value[] as habitat for endangered, rare or threatened species" and "can be adequately served by all required utilities and public services"; and (4) its approval "would not result in any significant effects relating to traffic, noise, air quality, or water quality." (Guidelines, § 15332; accord, *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1093.)

Guidelines section 15300.2, subdivision (c) provides an exception to CEQA's categorical exemptions. It provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." We refer to this as the unusual circumstances exception. The Board found that the exception did not apply because the project as proposed and approved would not have any significant effects on the environment due to unusual circumstances.

The Board approved (1) a use permit to demolish the existing dwelling on the lot, (2) a use permit to construct the proposed unit, (3) an administrative use permit to allow a 35-foot average height limit for the main building (with 28 feet being the maximum usually allowed), and (4) an administrative use permit to reduce the setback of the front yard to 16 feet (with 20 feet usually required). The Board imposed various "standard conditions" on the proposed construction, including requiring the permit applicant to secure a construction traffic management plan, comply with storm water regulations for small construction activities, and take steps to minimize erosion and landslides when construction takes place during the wet season.

"Several residents of the City, including appellant Susan Nunes Fadley, filed an appeal with the [Berkeley] city council, arguing in part that CEQA's categorical exemptions do not apply because the proposed project's 'unusual size, location, nature and scope will have significant environmental impact on its surroundings.' They asserted

3

that the proposed residence would be 'one of the largest houses in Berkeley, four times the average house size in its vicinity, and situated in a canyon where the existing houses are of a much smaller scale.' They submitted evidence that, of Berkeley's over 17,000 single-family residences, only 17 exceed 6,000 square feet, only 10 exceed 6,400 square feet, and only one exceeds 9,000 square feet. They also asserted that the proposed residence would exceed the maximum allowable height under Berkeley's municipal code and would be inconsistent with the policies of the City's general plan, and that an EIR [environmental impact report] is appropriate to evaluate the proposed construction's potential impact on noise, air quality, historic resources, and neighborhood safety. In response, the City's director of planning and development stated that 16 residences within 300 feet of the project have a greater floor-area-to-lot-area ratio and that 68 Berkeley 'dwellings' exceed 6,000 square feet, nine exceed 9,000 square feet, and five exceed 10,000 square feet.

"The city council received numerous letters and e-mails regarding the appeal, some in support and some in opposition. Among the appeal's supporters was Lawrence Karp, an architect and geotechnical engineer. In a letter dated April 16, 2010, Karp stated (1) he had reviewed the architectural plans and topographical survey filed with the Board, and had visited the proposed construction site; (2) '[p]ortions of the major fill for the project are shown to be placed on an existing slope inclined at about 42º (~1.1h:1v) to create a new slope more than 50º (~0.8:1v)'; (3) '[t]hese slopes cannot be constructed by earthwork and all fill must be benched and keyed into the slope which is not shown in the sections or accounted for in the earthwork quantities. To accomplish elevations shown on the architectural plans, shoring and major retaining walls not shown will have to be constructed resulting in much larger earthwork quantities than now expected'; (4) the 'massive grading' necessary would involve 'extensive trucking operations'; (5) the work that would be necessary 'has never before been accomplished in the greater area of the project outside of reservoirs or construction on the University of California campus and Tilden Park'; (6) the project site is 'located alongside the major trace of the Hayward fault and it is mapped within a state designated earthquake-induced landslide hazard

4

zone'; and (7) 'the project as proposed is likely to have very significant environmental impacts not only during the construction but in service due to the probability of seismic lurching of the oversteepened side-hill fills.'

"In a second letter addressing the investigation of geotechnical engineer Alan Kropp, Karp stated (1) no 'fill slopes' were shown in Kropp's plan and 'the recommendations for retaining walls do not include lateral earth pressures for slopes with inclinations of more than 2h:1v (~27º) or for wall heights more than 12 feet'; (2) the project's architectural plans 'include cross-sections and elevations that are inconsistent with the Site Plan and limitations in' Kropp's report; (3) 'all vegetation will have to be removed for grading, and retaining walls totaling 27 feet in height will be necessary to achieve grades. Vertical cuts for grading and retaining walls will total about 43 feet (17 feet for bench cutting and 26 feet for wall cutting). [¶] A drawing in the [Kropp] report depicts site drainage to be collected and discharged into an energy dissipater dug into the slope, which is inconsistent with the intended very steep fill slopes'; and (4) 'the project as proposed is likely to have very significant environmental impacts not only during construction, but in service due to the probability of seismic lurching of the oversteepened side-hill fills.'

"In response, Kropp stated that the project site is in an area where an investigation is required to evaluate the potential for landslides, and that he had conducted the necessary investigation and found there is, in fact, no landslide hazard. Kropp also stated that, in raising concerns about 'side-hill fill,' Karp had 'misread[]' the project plans. According to Kropp, 'the only fill placed by the downhill portion of the home will be backfill for backyard retaining walls and there will be no side-hill fill placed for the project. The current ground surface, along with the vegetation, will be maintained on the downhill portion of the lot.' Because there will not, as Karp claimed, be any 'steep, side-hill fill constructed,' Karp's concerns do not apply to the proposed construction. A civil engineer, Jim Toby, also submitted a letter stating that he saw 'no evidence' in the project plans that fill will be placed ' "directly on steep slopes" ' and that Karp's contrary assertion is based on a 'misreading' of the plans.

5

"In support of the permit approval, the City's director of planning and development submitted a supplemental report stating: 'A geotechnical report was prepared and signed by a licensed Geotechnical Engineer and a Certified Engineering Geologist. This report concluded that the site was suitable for the proposed dwelling from a geotechnical standpoint and that no landslide risk was present at the site. Should this project proceed, the design of the dwelling will require site-specific engineering to obtain a building permit.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1093–1095.)

The city council took up the appeal at a meeting on April 27, 2010. After hearing from speakers, including Karp and Kropp, the council adopted the Board's findings, affirmed the permit approval, and dismissed the appeal. The city planning department later filed a notice of exemption stating that the project was categorically exempt from CEQA under Guidelines sections 15303, subdivision (a) (small structures/single-family residences), and 15332 (in-fill development projects), and that the unusual circumstances exception (Guidelines, § 15300.2) did not apply.

"Fadley then filed a petition for writ of mandate in the trial court, joined by appellant Berkeley Hillside Preservation, which is a self-described unincorporated association of 'City residents and concerned citizens who enjoy and appreciate the Berkeley hills and their environs and desire to protect the City's historic, cultural, architectural, and natural resources.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1096.) Appellants briefly contended that the City erred in finding that the project was categorically exempt from CEQA review but acknowledged that the deferential substantial evidence standard of review applied. They contended that the unusual circumstances *exception* to the categorical exemptions applied, because the project may result in significant environmental impacts due to unusual circumstances. Following a hearing, the trial court denied the petition. It first concluded that the administrative record contained substantial evidence to support the City's application of the Class 32 in-fill and Class 3 small-structures categorical exemptions. It next found that the unusual circumstances exception (Guidelines, § 15300.2, subd. (c)) did not preclude application of those categorical exemptions because, notwithstanding evidence of potentially

6

significant environmental effects, the proposed project does not present any unusual circumstances. Appellants appealed to this court.

Similar to their strategy in the trial court, appellants conceded that "the deferential substantial evidence standard applies to the City's initial choice of applicable categories," and thus did not challenge, as an evidentiary matter, the findings that those exemptions applied. They did argue in passing, however, that as a legal matter, the exemptions could not be applied in this situation because the City had imposed mitigation measures directed at the increased traffic in the area, which precluded a finding of a categorical exemption. Most of appellants' argument focused on whether there was a fair argument of a significant effect on the environment based on potential geotechnical impacts, detrimental effects on aesthetics and views, inconsistencies with the City's general plan and zoning, and traffic impacts. According to appellants, these potential environmental impacts constituted an unusual circumstance that triggered the exception to categorical exemptions under Guidelines section 15300.2, subdivision (c).

This court agreed with appellants that the potential geotechnical effects of the project could affect the environment and thus the unusual circumstances exception to the applicable categorical exemptions applied. In light of that conclusion, the court did not address appellants' argument that the Board's adoption of a traffic-management plan was a mitigation measure that precluded a finding of a categorical exemption.

The Supreme Court reversed, concluding it was "apparent" that neither the trial court nor this court had correctly analyzed whether unusual circumstances precluded the application of categorical exemptions. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1118.) The court remanded the case to this court, and the parties have filed supplemental briefs.

II.
DISCUSSION

A. *Legal Framework and Standard of Review Announced in* Berkeley Hillside.

In this court's previous opinion, we held that where there is a fair argument that proposed activity may have an effect on the environment, that is itself an unusual circumstance triggering the unusual circumstances exception to CEQA's categorical

7

exemptions. The Supreme Court held that our conclusion was incorrect. It noted the approach was inconsistent with the Legislature's direction to the Secretary of the Natural Resources Agency (Secretary), in adopting categorical exemptions to CEQA, to " 'make a finding that the list or classification of projects . . . *do not* have a significant effect on the environment.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1100, quoting former § 21084, italics added.) "[T]he Legislature, through the Guidelines, intended to enumerate classes of projects that *are* exempt from CEQA because, notwithstanding their *potential* effect on the environment, they already 'have been determined not to have a significant effect on the environment.' (§ 21084, subd. (a).) The Guidelines implement this intent, by setting forth the 'classes of projects' that the Secretary, acting '[i]n response to [the Legislature's] mandate,' 'has found . . . do not have a significant effect on the environment.' (Guidelines, § 15300.) Thus, construing the unusual circumstances exception as requiring more than a showing of a fair argument that the proposed activity may have a significant environmental effect is fully consistent with the Legislature's intent." (*Berkeley Hillside*, at pp. 1101–1102, original italics.)

"[T]o establish the unusual circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption. (§ 21151.) Such a showing is inadequate to overcome the Secretary's determination that the typical effects of a project within an exempt class are not significant for CEQA purposes. On the other hand, evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual. An agency presented with such evidence must determine, based on the entire record before it—including contrary evidence regarding significant environmental effects—whether there is an unusual circumstance that justifies removing the project from the exempt class." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105, original italics.) "A party invoking the exception may establish an unusual circumstance without evidence of an environmental effect, by showing that the project has some feature that distinguishes it from others in the exempt class, such as its size or location. In such a case, to render the

exception applicable, the party need only show a reasonable possibility of a significant effect due to that unusual circumstance. Alternatively, under [the Supreme Court's] reading of the guideline, a party may establish an unusual circumstance with evidence that the project will have a significant environmental effect. That evidence, if convincing, necessarily also establishes 'a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' (Guidelines, § 15300.2, subd. (c).)" (*Ibid.*)

Our review of the City's decision that unusual circumstances are not present is governed by section 21168.5, which provides that this court's inquiry is "whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1109.) "[B]oth prongs of section 21168.5's abuse of discretion standard apply on review of an agency's decision with respect to the unusual circumstances exception. The determination as to whether there are 'unusual circumstances' (Guidelines, § 15300.2, subd. (c)) is reviewed under section 21168.5's substantial evidence prong. However, an agency's finding as to whether unusual circumstances give rise to 'a reasonable possibility that the activity will have a significant effect on the environment' (Guidelines, § 15300.2, subd. (c)) is reviewed to determine whether the agency, in applying the fair argument standard, 'proceeded in [the] manner required by law.' " (*Id.* at p. 1114.)

"Whether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry, ' "founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct.' " ' [Citation.] Accordingly, as to this question, the agency serves as 'the finder of fact' [citation], and a reviewing court should apply the traditional substantial evidence standard that section 21168.5 incorporates. [Citation.] Under that relatively deferential standard of review . . . reviewing courts, after resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding

must affirm that finding if there is any substantial evidence, contradicted or uncontradicted, to support it." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)

Where there are unusual circumstances, "it is appropriate for agencies to apply the fair argument standard in determining whether 'there is a reasonable possibility [of] a significant effect on the environment due to unusual circumstances.' (Guidelines, § 15300.2, subd. (c).) As to this question, the reviewing court's function 'is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made.' " (*Berkeley Hills*, *supra*, 60 Cal.4th at p. 1115.) "This bifurcated approach to the questions of unusual circumstances and potentially significant effects comports with our construction of the unusual circumstances exception to require findings of *both* unusual circumstances *and* a potentially significant effect." (*Ibid.*, original italics.)

B. *Substantial Evidence Supports Finding of No Unusual Circumstances.*

1. Applicability of categorical exemptions.

In reviewing the City's decision once again, we begin with appellants' concession that the record contains substantial evidence supporting the applicability of the relevant categorical exemptions. Again, although appellants argued to the city council that the project is not categorically exempt, they have not pursued this argument in any judicial forum given the deferential standard of review, and this position has not changed on remand from the Supreme Court. That is, they do not contend the administrative record lacks substantial evidence to support the City's determination that the Class 3 and Class 32 exemptions apply to the proposed construction. (See *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251.) We therefore start from the understanding that the Board's finding that the proposed construction belongs to a classification of projects that *do not have* a significant effect on the environment is supported by substantial evidence (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1101), which in turn means there is substantial evidence the project involves a single-family residence in an urbanized area (Guidelines, § 15303, subd. (a)) and it also (1) is consistent with the applicable general plan as well as with applicable zoning designation and regulations, (2) is located within city limits on a

10

site of no more than five acres surrounded by urban uses, (3) is situated in an area that has no value for threatened species and can be adequately served by public services, and (4) *will not result in any significant effects* relating to traffic, noise, air quality, or water quality (Guidelines, § 15332).

Where this court previously erred was in accepting appellants' concession but then proceeding to separately analyze the unusual circumstances exception to the exemptions, without sufficiently appreciating how the two are related. This led to the analytical mistake of using the de novo standard of review to consider whether unusual circumstances were present. We concluded *as a matter of law* that the size of the proposed structure—a 6,478-square-foot home with an attached 3,394-square-foot, 10-car garage (combining for a total of just over 9,800 square feet)—was "unusual" within the meaning of the unusual circumstances exception. Again, however, we in fact review an agency's decision that a particular project does not present circumstances that are unusual for projects in an exempt class under the "relatively deferential" substantial-evidence standard of review. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.) "[A]fter resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding [whether a particular project presents circumstances that are unusual for projects in an exempt class], [we] must affirm that finding if there is *any substantial evidence*, *contradicted* or uncontradicted, to support it." (*Ibid.*, italics added.)

On remand, appellants continue to argue that the project presents unusual circumstances based on its size, environmental setting, and its inconsistency with Berkeley's general plan. They acknowledge that we review the City's determination of unusual circumstances for substantial evidence, but they do not sufficiently address this in the context of their previous concession that substantial evidence *supports* the City's determination that the Class 3 and Class 32 exemptions apply. Appellants focus on all the characteristics of the project that distinguish it from the typical Berkeley house: there are only a handful of single-family residences in the City that are more than 6,400 square feet, it will be located in a earthquake-induced landslide hazard zone, it will be

11

architecturally inconsistent with other homes in the area, and it will adversely affect views.  But to concede that substantial evidence supports the applicability of the Class 3 and Class 32 exemptions on this record, thereby putting the proposed project within a class that presumptively does not have an effect on the environment, is to concede, in effect, that there is no feature distinguishing it from the exempt class.[3]

As parties challenging the applicability of a categorical exemption, appellants had the burden below to produce evidence supporting an exception to the exemption.  (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105.)  What their argument boils down to— here again on remand—is that they presented evidence the proposed home will be "unusual" in the sense it will not be "typical."  Even assuming they met their burden of production with this argument, they fail to come to terms with the stringent standard of review that *Berkeley Hillside* directs us to apply at this stage of the proceedings.  Our focus at this point is to resolve all evidentiary conflicts in the City's favor, indulge in all legitimate and reasonable inferences to uphold the City's finding, and affirm that finding if there is any substantial evidence, even if contradicted, to support it.  (*Id.* at p. 1114.)

---

[3] We note a line of argument appellants have chosen not to pursue on remand. One way to establish an unusual circumstance is to provide evidence the project in fact "*will* have a significant effect" on the environment despite the fact it would otherwise be included in a class of projects that generally *do not* have an effect on the environment. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105, original italics.)  There are certainly scenarios where a project falls into a class that is generally exempt but where evidence shows it will have a significant environmental effect, such as a residence proposed to be built on an environmentally sensitive area that could be environmentally impacted by the construction of a single home.  (See *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1103, 1106–1107 (*Salmon Protection*) [residence not categorically exempt where evidence that construction would have significant environmental effects].)  Appellants do not contend this is the case and instead claim they have established unusual circumstances under the Supreme Court's alternative test, that is, "*without evidence of an environmental effect*, by showing that the project has some feature that distinguishes it from others in the exempt class, such as *its size or location*." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1105, italics added.)

We do not hesitate to do so in light of appellants' concession that substantial evidence supports the applicability of the relevant exemptions here.

The proper resolution of this case in light of the Supreme Court's guidance is clear upon close scrutiny of each of appellants' individual arguments. We now turn to those arguments.

### 2. Size of proposed home.

When they challenged the Board's approval of the project to the City, appellants argued the project was "not a standard single family home for two people." They claimed that public statements by Kapor and Kapor-Klein about planned philanthropic activities at the home indicated the residence might fall outside the City's definition of low-impact home occupation and might be used for "activities other than normal residential occupancy by two people." The City's director of planning and development responded that the home was to be built on the second largest among the 48 parcels in the area, and that 16 parcels within 300 feet of the project site would have development with a larger floor-area-to-lot-area ratio, meaning the lot where the project would be located could support the large proposed building. The city council ultimately sided with the City, and the planning department filed a notice of exemption stating the project was categorically exempt as a single-family residence under Guidelines section 15303, subdivision (a).

Appellants essentially acknowledge, on the one hand, that substantial evidence supports this conclusion, yet continue to argue, on the other hand, that the home's size and location is so distinguishable that the unusual circumstances exception applies. We reject these inconsistent contentions, especially in light of the fact the project is not unusual when compared to the size of other homes in the immediate vicinity. (See *Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1118–1119 [agencies have discretion to consider conditions in vicinity of proposed project in determining whether unusual circumstances exist].) To be sure, Kapor and Kapor-Klein propose to build a home that certainly could be considered unusually large, as that term is generally understood by a layperson. Our concerns about the size and scale of the proposed project are partially

what led us to conclude originally that the dimensions of the proposed structure presented unusual circumstances. But we may not substitute our judgment on this point. Following the Supreme Court's guidance in *Berkeley Hillside*, we conclude that the size and scale of the home do not present unusual circumstances, as that term is used in Guidelines, section 15300.2, subdivision (c).

### 3. Setting of proposed home.

Appellants continue to argue that the environmental setting of the project is unusual. They rely on evidence that the site is located near the Hayward fault and within an "earthquake-induced landslide hazard zone," on a narrow and steep one-lane road, and in a neighborhood "defined by its aggregation of historically and architecturally significant buildings." Appellants do not come to terms with evidence pointing in the other direction. Geotechnical engineer Kropp explained that although the project is located in an area designated under the Seismic Hazards Mapping Act (§ 2690 et seq.) as having a *potential* for earthquake-induced landslides, a site-specific study revealed no such landslide hazard was present. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114 [reviewing court must affirm agency's finding if there is any substantial evidence, even if contradicted, to support it].) And although it may be true the home will be built on a single-lane road, there is scant, if any, evidence this will affect the environment. (See *post*, § II.C.) As for its location near buildings with unique character, the City's director of planning and development explained that the site is not readily visible from the public right-of-way.

In a related argument, appellants also continue to contend that the project is unusual because it is inconsistent with the City's general plan and local planning policies. And although appellants do not specifically mention the issue on remand, they originally argued that alleged traffic impacts were an unusual feature of the project. Again, though, it is conceded that there is substantial evidence to support findings that the project is *consistent* with *the applicable general plan* and *all applicable zoning designations and regulations*, occurs within city limits on a project site of no more than five acres *substantially surrounded by urban uses*, can be adequately served by public services, and

14

*will not result* in *any significant effects* related to traffic. (Guidelines, § 15332.) We cannot at once accept these findings yet also conclude that the project is unusual because appellants now wish to argue to the contrary, without pointing to any new or different evidence.

### 4. Alleged geotechnical impacts.

Finally, we briefly address the alleged geotechnical impacts of the project. When we first considered the project, we concluded there was a fair argument of a significant effect on the environment based on Karp's conclusion that geotechnical issues were present at the site. As we already have explained, the Supreme Court held we erred as a legal matter, because appellants were required to show more than a fair argument of a significant effect. (*Berkeley Hillside*, *supra*, 60 Cal.4th at pp. 1102, 1104.) The Supreme Court further held this court erred as a factual matter in relying on Karp's expert opinion insofar as the opinion was based on the potential effects of unapproved activities that Karp believed would be necessary because the project, as approved, could not be built as described. (*Id.* at pp. 1120–1121.) Because, on remand, appellants do not specifically argue that any geotechnical issues present unusual circumstances, it suffices to note here that *Berkeley Hillside* forecloses the only geotechnical-impact arguments appellants have advanced to date, all of which are based on Karp's opinions.

### C. *Traffic-management Plan Did Not Amount to Mitigation Measure That Precluded Application of Categorical Exemptions.*

Having concluded that there are no unusual circumstances, we need not reach the next step in the Supreme Court's analysis. That is, we need not consider appellants' contention on remand that there is a fair argument of a reasonable possibility of a significant effect on the environment due to unusual circumstances. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115.) But the Supreme Court did flag an additional issue for our consideration, beyond the section 15300.2, subdivision (c) exception, and it is to that additional issue that we now turn.

In their original appeal to this court, appellants briefly argued that the imposition of traffic mitigation measures was "fatal" to the categorical exemptions, because the fact

the project "requires mitigation" means it cannot be subject to such an exemption.  This court did not address that issue in its original opinion in light of the conclusion that the unusual circumstances exception applied, and the Supreme Court did not address the issue in the first instance, instead leaving the issue for us to consider on remand. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1118, fn. 7.)  Here, on remand, appellants devote about a third of the legal analysis in their supplemental brief to arguing that the implementation of the traffic-management plan precludes application of categorical exemptions. A close review of the relevant traffic measures undermines appellants' contentions.

> 1.  Traffic-management plan for project construction.

When the Board approved the use permit for the project, it included various conditions under Berkeley Municipal Code section 23B.32.040.D, including a construction traffic management plan.  Under this condition, the applicant was required to secure the Berkeley traffic engineer's approval of a plan that "shall include the locations of material and equipment storage, trailers, worker parking, a schedule of site operations that may block traffic, and provisions for traffic control.  The City Zoning Officer and/or Traffic Engineer may limit off-site parking of construction-related vehicles if necessary to protect the health, safety, or convenience of the surrounding neighborhood."  In appellants' appeal to the city council, they complained about the environmental impact of the "massive excavation" needed to complete the project and claimed that the necessary truck traffic would cause "enormous" stress on Rose Street.  Karp likewise opined that the "massive grading necessary to achieve grades for the proposed project will involve extensive trucking operations, as a nearby site to stockpile and stage the earthwork is not available."

In a memo to the city council recommending that it affirm the Board's approval of the project, the office of the city manager acknowledged that about 1,500 cubic yards of soil would be cut from the site, with 800 cubic yards retained onsite to be used as backfill.  Because the excavated soil would take up more area than compacted earth, the total amount of soil to be removed would be about 940 cubic yards, to be removed using

20-yard trucks. The memo stressed that with the exception of one condition imposed on the applicant, "the conditions of approval for this project are standard conditions imposed on residential development in the Hills which are not intended to address any specific environmental impacts resulting from construction of this project. Rather, they represent the City's attempt to generally minimize detrimental impacts of residential development in the Hills." The one unique approval condition required that a draft version of the construction-management plan be presented to the neighborhood. Again, the memo stressed the notice condition "ha[d] no relation to any potential environmental impact."

2. Analysis.

A "project" is defined in the Guidelines as including "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (Guidelines, § 15378, subd. (a).) A lead agency for a project "has authority to require feasible changes in any or all activities involved in the project in order to substantially lessen or avoid significant effects on the environment." (Guidelines, § 15041, subd. (a).) Such mitigation may include (a) avoiding an environmental impact altogether by not taking an action or parts of an action, (b) minimizing environmental impacts by limiting the degree or magnitude of an action and its implementation, (c) rectifying the environmental impact by repairing, rehabilitating, or restoring the impacted environment, (d) reducing or eliminating the environmental impact over time by preservation and maintenance operations, or (e) compensating for the impact by replacing resources or environments or by providing substitutes for them. (Guidelines, § 15370.) As Division Three of this court has observed, "The distinction between elements of a project and measures designed to mitigate impacts of the project may not always be clear." (*Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 656, fn. 8 (*Lotus*).) Here, however, it is clear the traffic-management plan was not a mitigation measure that precludes application of categorical exemptions.

Appellants rely on this court's opinion in *Salmon Protection*, *supra*, 125 Cal.App.4th at pages 1106–1107, which held that an agency should determine whether a

17

project is eligible for a categorical exemption without relying on any proposed mitigation measures, because *only* those projects having no significant effect on the environment are categorically exempt from CEQA review. In *Salmon Protection*, Marin County approved a home-construction project within a riparian area previously designated by the county "as an environmental resource of critical concern." (*Id.* at p. 1102.) The county found the project was exempt because it involved the construction of a single-family residence (Guidelines, § 15303, subd. (a)), but the approval was "subject to conditions meant to minimize 'adverse physical effects on the natural environment.' " (*Salmon Protection*, at p. 1103.) Thus the project was specifically conditioned on measures meant to mitigate impact on a habitat for a threatened species, meaning the activity might have a significant effect on the environment, thus precluding application of a categorical exemption. (*Id.* at pp. 1106–1107.)

In *Lotus*, *supra*, 223 Cal.App.4th 645, the court addressed the adequacy of an EIR analyzing proposed highway construction adjacent to old-growth redwood trees (*id.* at pp. 647–648), as opposed to the approval of a categorical exemption as was the case in *Salmon Protection*, *supra*, 125 Cal.App.4th at page 1103. Like the project in *Salmon Protection*, however, the *Lotus* construction was found by the reviewing agency not to involve any significant effect on the environment, but only *after* mitigation measures were made a condition of project approval. (*Lotus*, at pp. 648–649.) *Lotus* held that actions such as restorative planting, removal of invasive plants, and the use of an arborist and specialized equipment were "plainly mitigation measures and not part of the project itself," resulting in the improper compression of environmental impacts and mitigation measures into a single issue in the EIR. (*Id.* at p. 656 & fn. 8.) By contrast, Division Two of this court held that San Francisco's imposition of a 10-cent fee as part of an ordinance restricting the use of disposable bags at retail stores was part of the plan to address the problem of single-use bags and was not a mitigation measure designed to alleviate difficulties with the original plan, as the fee did not involve a "proposed subsequent action[] by the project's proponent to mitigate or offset the alleged adverse environmental impacts" of the project. (*Save the Plastic Bag Coalition v. City and*

18

*County of San Francisco* (2013) 222 Cal.App.4th 863, 868, 882–883 (*Save the Plastic Bag Coalition*) [upholding categorical exemption].)

Although the traffic plan measure here is not as straightforward as the 10-cent fee at issue in *Save the Plastic Bag Coalition*, the plan nonetheless is not proposed subsequent action taken to mitigate any significant effect of the project, and therefore is not a mitigation measure that precludes the application of a categorical exemption. (*Save the Plastic Bag Coalition*, *supra*, 222 Cal.App.4th at pp. 882–883.) We agree with respondents that the case is analogous to *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 736, where Division Two of this court concluded that the unusual circumstances exception did not apply to the construction of a single-family home in Ukiah. In response to one challenger's observation that he had observed a "substantial amount" of water runoff from the project's lot onto his property, the court noted that drainage concerns were adequately addressed by the standard provisions of Ukiah's building code, which provided authority to a building official to correct any unusual drainage problem. (*Id.* at pp. 735–736.) The court further observed, "Surface and groundwater runoff are common and typical concerns with sloping lots and in this context on the evidence presented cannot be considered unusual circumstances." (*Id.* at p. 736.) Although appellants here do not specifically rely on the traffic-management plan to support their unusual circumstances argument, similar concerns guide our analysis. Managing traffic during the construction of a home is a common and typical concern in any urban area, and especially here given the narrow roads in the area and the volume of dirt to be removed. We reject appellants' argument that implementing a traffic plan amounted to a mitigation measure that precluded the application of two categorical exemptions.

## III.
### DISPOSITION

The trial court's judgment is affirmed. Respondents shall recover their costs on appeal.

                                                _____

                                                Streeter, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.

A131254/*Berkeley Hillside Preservation v. City of Berkeley*

Filed 10/15/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BERKELEY HILLSIDE PRESERVATION et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF BERKELEY et al.,<br><br>        Defendants and Respondents;<br><br>DONN LOGAN et al.,<br><br>        Real Parties in Interest and Respondents. | A131254<br><br>(Alameda County Super. Ct. No. RG10517314)<br><br>**ORDER DENYING PETITION FOR REHEARING AND CERTIFYING OPINION FOR PUBLICATION** |

THE COURT:

Appellants' Petition for Rehearing is denied.

The opinion in the above-entitled matter filed on September 23, 2015, was not certified for publication in the Official Reports. For good cause, the requests for publication are granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports. Listing of counsel is attached hereto.

Dated: _____          _____

                                                                        Ruvolo, P.J.

Berkeley Hillside Preservation v. City of Berkeley (A131254)

| | |
|---|---|
| Trial court: | Alameda County Superior Superior Court |
| Trial judge: | Hon. Frank Roesch |

Counsel for Plaintiff/Appellant: Susan Brandt-Hawley
Brandt-Hawley Law Group
Attorneys for Plaintiffs and Appellants Berkeley
Hillside Preservation, et al.

Counsel for Defendants/
Respondents:

Zach Cowan, City Attorney for City of Berkeley
Laura McKinney, Deputy City Attorney
Attorneys for Defendants and Respondents City of
Berkeley and City Council of the City of Berkeley

Meyers, Nave, Riback, Silver & Wilson
Amrit S. Kulkarni
Julia L. Bond
Attorneys for Respondents and Real Parties in Interest
Mitchell Kapor and Freada Kapor-Klein